FILED
AUG 0 5 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, DISTRICT LODGE NO. 24,
LOCAL 1005,

                              Plaintiff,

        v.

FREIGHTLINER, LLC/DAIMLER
TRUCKS NORTH AMERICA, LLC,

                              Defendant.

Civ No. 08-CV-1327-AC

FINDINGS AND RECOMMENDATIONS

ACOSTA, Magistrate Judge:

        International Association of Machinists and Aerospace Workers, District Lodge No. 24,

Local 1005 seeks to enforce an arbitration award reinstating Ryan Schulenberg to employment with

Freightliner, LLC/Daimler Trucks North America, LLC.  Freightliner terminated Schulenberg's

employment in 2006 for violating Freightliner's policy prohibiting sexual harassment.  Freightliner

contends that the court should not enforce the arbitrator's reinstatement award because it violates

1 - FINDINGS AND RECOMMENDATIONS

the public policy embodied in Title VII, and because the basis for the arbitrator's ruling does not "draw its essence" from the parties' collective bargaining agreement ("CBA" or "contract"). Both the Union and Freightliner have filed motions for summary judgment to obtain relief on their respective positions.

Based on the record the parties submitted and applying the controlling scope of review, the court concludes that the arbitrator's award did not draw its essence from the parties' collective bargaining agreement. Specifically, in reaching his decision, the arbitrator did not consider the final and binding disciplinary action Freightliner imposed against Schulenberg in 1999 for violating its sexual harassment policy. The arbitrator, without authority drawn from the CBA, reevaluated and effectively nullified this prior final disciplinary action between the parties. In doing so, he also directly contravened the CBA's explicit time limits for grieving disciplinary action. Therefore, the arbitrator's award should be vacated.

However, the case should be remanded to the arbitrator. Specifically, remand is necessary here, and not futile, because the arbitrator must determine whether Freightliner had just cause to terminate Schulenberg in 2006, when considering Schulenberg's 1999 discipline and the final warning. Accordingly, Freightliner's motion for summary judgment should be granted and the Union's motion for summary judgment should be denied, and the case should be remanded to the arbitrator for further proceedings.

## Background

The parties stipulate to or do not dispute the following material facts.

A.    Relevant Contract and Policy Provisions.

The parties' CBA contains provisions relevant to employee discipline generally and to the

2 - FINDINGS AND RECOMMENDATIONS

resolution of this specific case.

Article XIX, entitled "Grievance Procedure," provides in relevant part:

Section 2.  Any employee or Union grievance must be submitted in writing and properly signed by the employee or Union official claiming to be aggrieved within ten (10) working days of the date upon which the event or events alleged to constitute the grievance were first known or should have been known to the employee or Union official; except that any grievance alleging unjustified termination or misapplication of layoff must be submitted within three (3) working days.

Section 3.  In the event that the parties shall be unable to adjust any grievance or dispute arising under the terms of this Contract, the following steps shall be taken:

. . . .

Step 3.  In the event the Union wishes to proceed with Step 3, the Union shall make their request in writing, with a copy of the grievance to the Plant Manager, for arbitration by a third party.  The arbitrator shall be chosen mutually by the Employer and the Union. The decision of the arbitrator shall be final and binding upon both parties.

. . . .

The decision of the arbitrator shall be final and binding upon both parties, but the arbitrator shall have no power to render a decision which adds to, subtracts from, or modifies this Agreement. . . .

. . . .

Section 4.  It is understood that the Union will be the moving party in each step of the grievance procedure.  Grievances not advanced to the next step within the time limits of this Article shall be considered withdrawn.  Time limits in this Article may be extended upon mutual agreement in writing between the Company and the Union.

(Stipulated Joint Statement of Facts ("Stipulation"), Ex. A at 39-42.[1])  Article XVIII, entitled

---

[1] Each exhibit attached to the Stipulation bears a letter designation assigned in connection with the Stipulation but the exhibits are not separately paginated.  Therefore, page citations to these exhibits are to their original page numbers or, if there are no original page numbers, to the page's position in the order of pages of the cited exhibit.

"Miscellaneous Provisions," Section 9, states:

> The Company will make a consistent effort to issue warnings or discipline, including attendance, within 15 days of the alleged infraction. . . .

> Warning letters unrelated to attendance problems will be reviewed by the Employer at the request of an employee after six (6) months from the date of issue and may be subject to the grievance procedure."

(Stipulation, Ex. A at 38.)   Article XXIII, entitled "Management Rights," provides that "[a]ll management rights not expressly curtailed or surrendered by this Agreement are reserved to the Employer." (Stipulation, Ex. A at 44.)

The CBA incorporates Freightliner's policies prohibiting discrimination and harassment.

Article VI, entitled "Non-Discrimination," states:

> It is the continuing policy of the Employer and the Union that the provisions of this Agreement shall be applied to all persons without regard to race, color, religion, national origin, sex, age or disability.

> All employees are encouraged to report discrimination and harassment of any nature without fear of retaliation.  All employees should refer to the posted Company Policy for further clarification.

(Stipulation, Ex. A at 21.)  Freightliner's Anti-Harassment Policy provides in relevant part:

## II. POLICY

Harassment of employees in the workplace does not contribute to good working relations, productivity, or morale and will not be condoned or tolerated.  Any harassment, whether or not it constitutes illegal discrimination, is strictly prohibited. Any employee who engages in harassment will be disciplined up to and including discharge.

## III. DEFINITION

Harassment is behavior (words, gestures, actions) which annoys, alarms or abuses another employee and which undermines the integrity of the employment relationship by interfering with an employee's work performance, or of creating an intimidating, hostile, or offensive working environment.

(Stipulation, Ex. B at 1.) Freightliner's "Corporate Policy Fair Employment Practices" provides in

relevant part:

> It is Freightliner's policy to provide an environment that is free from unlawful harassment. Therefore, all forms of harassment related to an employee's race, color, religion, sex, gender, age, national origin, disability or veteran status constitute violations of this policy. In furtherance of this policy, Freightliner LLC will not tolerate the use of racial, religious, sexual gender-based, age-related, ethnic, or disability-related epithets, innuendos, slurs, or jokes within its facilities. In addition, all forms of verbal, non-verbal, and physical harassment based on the above categories are prohibited. . . .

> With regard to sexual harassment in particular, unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature are considered instances of sexual harassment when:

> • Such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creates an intimidating, hostile, or offensive work environment. . . .

> It is important to remember that behavior which one individual considers innocent or harmless may be regarded as sexual harassment by another person. . . . Freightliner LLC will not tolerate sexual harassment of its employees by anyone, including Freightliner LLC officials, other employees or individuals conducting business with Freightliner. Any employee who violates this harassment policy . . . will be subject to disciplinary action, up to and including termination of employment.

> . . . .

> The company will immediately thoroughly investigate all incidents and will take prompt and effective remedial action that stops the harassment. The remedial action may include oral warnings, written warnings, transfers, and other discipline or action, including termination, that stops the harassment. . . .

(Stipulation, Ex. C at 1-2.)

In addition to containing substantially the same language as appears in the "Corporate Policy

Fair Employment Practices," Freightliner's "Discrimination, Equal Employment Opportunity and

Harassment Complaint Procedures" also provides that "[w]here investigation discloses harassment,

Freightliner LLC will take prompt and effective remedial action which may include termination of

the harasser." (Stipulation, Ex. D at 4.)

The CBA contains no memoranda of understanding modifying the CBA's provisions or changing the applicability of Freightliner's anti-discrimination policies to Union employees. Neither party cited, and the record contains no reference to, any past practice, practices of the industry, or plant customs relevant to application of the contractual deadlines for filing grievances, challenging termination, or seeking review of past discipline.

B.    Schulenberg's 1999 Discipline.

On July 28, 1999, following an investigation of alleged sexual harassment, Freightliner issued a "final warning" letter to Schulenberg for violating Freightliner's sexual harassment policy by engaging in verbal conduct toward a female co-worker.    In the letter, Freightliner told Schulenberg:

> In general, the investigation revealed that many employees, male and female, have engaged in a variety of sexually oriented activities that are prohibited by the Freightliner policies.
>
> . . . .
>
> You, specifically, have been identified as an individual who has participated in one or more prohibited activities.
>
> You are put on final notice that any future engagement by you in this type of prohibited behavior will be cause for more severe discipline up to an [sic] including discharge. . . .

(Declaration of Daniel R. Barnhart ("Barnhart Decl."), Ex. U-7.) The sexual harassment allegations that prompted Freightliner's investigation appeared in a June 17, 1999, complaint filed with the Oregon Bureau of Labor and Industries ("BOLI"). Regarding Schulenberg specifically, the complaint alleged that he said to the complainant "Nice tongue ring, are you going to start sucking a lot of peter?" (Barnhart Decl., Ex. U-6 at 3.)

6 - FINDINGS AND RECOMMENDATIONS

The 1999 final warning letter constituted disciplinary action against Schulenberg, but neither he nor the Union filed a grievance challenging it. (Stipulation, Ex. G at 5.) Furthermore, the record does not disclose that at any time following imposition of the 1999 final warning, Schulenberg ever requested that Freightliner, in accordance with the CBA, "review" the 1999 discipline and place it into the grievance process. Freightliner relied on the 1999 final warning letter and the conduct upon which it was based, as that conduct was described in the BOLI complaint, in deciding to terminate Schulenberg in 2006.

Both the 1999 final warning letter and the BOLI complaint were admitted into evidence at the 2006 arbitration. (Stipulation, Ex. G at 2.) In that proceeding, neither the Union nor Schulenberg disputed that Schulenberg had received the 1999 final warning letter or that the final warning had been based on the allegation in the BOLI complaint. At oral argument on the parties' cross-motions for summary judgment, the Union acknowledged that the 1999 final warning had not been grieved, had not been removed from Schulenberg's personnel record, was final between the parties, and had to be taken "within its four corners."

C.     Schulenberg's 2006 Termination.

In late June 2006, Freightliner hired two 20-year old female college students, JB and CB, to work on its truck assembly line as part of its summer intern program. (Stipulation, Ex. G at 6.) Schulenberg, age 31 at the time, thought JB was "fun and pretty," and on two separate occasions he invited her to go rafting with him, which invitations she declined. (*Id.*) Unbeknownst to Schulenberg, other co-workers had shared with JB rumors about Schulenberg's sexual practices and had advised JB to "stay away" from Schulenberg. (*Id.*)

Schulenberg subsequently learned that another employee had told JB "something about

7 - FINDINGS AND RECOMMENDATIONS

[Schulenberg's] sexual activities." (*Id.*) Concerned that this information would lower JB's opinion of him, Schulenberg asked to meet with her to explain the gossip about his personal sex life. (*Id.* at 6-7.) JB at first refused to meet with Schulenberg but then agreed to meet, and she told him that CB would accompany her when they met. (*Id.* at 7. )

The three met on Freightliner premises in an area near the employee break room, during a work break. (*Id.*) Schulenberg began by asking both JB and CB whether they were virgins, then told them that "whoever 'took their virginity away from them' would be a very lucky person." (*Id.*) He also stated that they would understand more about sexuality when they were sexually active. *Id.* Next, after asking JB what she had heard about him, Schulenberg proceeded to "explicitly describe to [JB and CB] his sexual exploits and preferences including the fact that he enjoyed it when his girlfriend urinated on him during sex," as well as describing other sexual activities which could be viewed "by a reasonable person as violating sexual taboos." (*Id.* at 7, 14.)

Although uncomfortable, disgusted, and upset by Schulenberg's statements, JB and CB did not report the conversation to Freightliner as sexual harassment, partly because they did not view it as sexual harassment and partly from fear that they could lose their relatively well-paying summer jobs. (*Id.* at 7.) Co-workers learned of the conversation, however, and on July 13 or 14 Freightliner began an investigation of the matter. (*Id.* at 7.) Schulenberg, who had recently participated in Freightliner's sexual harassment training, stated when interviewed a few days later that he "did not think that his conversation with [JB and CB] involved anything wrong[.]" (*Id.* at 8.)

On July 18, 2006, Freightliner "terminated [Schulenberg] for violating [Freightliner's] anti-harassment policy." (*Id.* at 8.) Freightliner based its termination decision on Schulenberg's 1999 final warning for violating the company's sexual harassment policy, the prior warning that any future

8 - FINDINGS AND RECOMMENDATIONS

violations of the company's sexual harassment policy would lead to termination, Schulenberg's

participation in sexual harassment training several months before the June 2006 incident, and on the

fact that Schulenberg had directed his conduct at two young summer interns whose employment had

just begun. (*Id.*)

D.    The Arbitration Decision on Schulenberg's 2006 Termination.

The Union filed a grievance on July 19, 2006, challenging Schulenberg's termination as

unjust. (*Id.* at 8.) Neither Schulenberg nor the Union denied that Schulenberg engaged in the

reported verbal conduct toward JB and CB. However, they vigorously contested that his verbal

conduct constituted sexual harassment or warranted the severest form of discipline, termination.

The grievance proceeded to arbitration, and in April and June 2008 an arbitrator heard the

grievance to decide: 1) whether Freightliner had just cause to discharge Schulenberg; and 2) if not,

the appropriate remedy to impose. (*Id.* at 1.) In his October 2008 decision, the arbitrator ordered

Freightliner to reinstate Schulenberg with back pay, less a four-week suspension. (Stipulation, Ex.

G at 18.) In reaching this decision, the arbitrator found Freightliner proved in July 2006 that

Schulenberg created an offensive work environment for the two female co-workers, in violation of

Freightliner's policies (*id.* at 14); that Schulenberg's actions in July 2006 did not rise to the level of

conduct warranting an immediate termination, absent "progressive discipline" (*id.* at 16); and that

Schulenberg was not a "repeat offender" such that reinstating him to employment would violate

public policy (*id.* at 18).

To reach his finding that Schulenberg was not a "repeat offender," the arbitrator did not

consider Schulenberg's 1999 final warning letter. In his decision, the arbitrator described the context

for the 1999 final warning letter and explained his reasons for not considering this disciplinary action

9 - FINDINGS AND RECOMMENDATIONS

in connection with Schulenberg's 2006 termination:

*1999 "final notice" to Grievant for engaging in sexual harassment.* In 1999, three female employees of Employer filed complaints and lawsuits against the Employer alleging sexual harassment by Grievant and three other male employees (BL, TS and RL). The lawsuit alleged that Grievant had stated to one female: "Nice tongue ring. Are you going to start sucking a lot of peter?" The suit also alleged that the Employer knew or should have known about the male employees' conduct but did not take prompt corrective action to eliminate the hostile work environment. Employer investigated and on July 28, 1999 issued a letter to Grievant. The letter stated, in part:

> In general, the investigation revealed that many employees, male and female, have engaged in a variety of sexually oriented activities that are prohibited by [the Employer's] policies.

> Conduct that is prohibited by the company policies include unwelcome sexual advances, requests for sexual favor, and other verbal or physical conduct of a sexual nature when such conduct has the purpose or effect of . . . creating an intimidating, hostile or offensive working environment. . . .[D]iscussions or comments regarding male and female anatomy . . . or sexual language that is unwelcome by other employees are among the prohibited activities.

> You, specifically, have been identified as an individual who has participated in *one or more* prohibited activities.

> You are put on *final notice* that *any future engagement by you in this type of prohibited behavior will be cause for more severe discipline up to an* [sic] *including discharge.*

. . . .

Very importantly, the Employer's 1999 "final notice" to Grievant does not contain any description of his misconduct in that incident, and the Employer presented no witness or other evidence that explained what Grievant did. The record does include a copy of a lawsuit filed by three women employed by Employer; they alleged that Grievant had stated to one female: "Nice tongue ring. Are you going to start sucking a lot of peter?" That comment, if made by Grievant, would clearly be offensive. However, I do not consider an *allegation* in that lawsuit as *proof* in this labor grievance arbitration. Without any evidence about Grievant's 1999 conduct, it is not possible to determine the significance of that conduct to the level of discipline the Employer imposed for Grievant's 2006 conduct. As a result, I do not consider the 1999 final notice.

10 - FINDINGS AND RECOMMENDATIONS

(Stipulation, Ex. G at 5, 15 (italics in original).)

Moving to the conduct giving rise to Schulenberg's termination, the arbitrator reviewed arbitration decisions that observed that progressive discipline for misconduct is the general rule, with exception for misconduct that is "particularly severe." (*Id.* at 15.)   The arbitrator found Schulenberg's 2006 conduct to be "toward the less serious end of the continuum," and that although "offensive and clearly unacceptable[,] was not so severe or heinous as to warrant an exception to the progressive discipline component of the just cause standard." (*Id.* at 16.)   The arbitrator then stated:

> The Employer notes that arbitrators generally have found that discharge is the appropriate penalty when an employee's violation of the harassment policy is a *repeat* offense. . . .   However, the Employer did not establish in this case that Grievant is a *repeat* offender:  as noted above, the Employer did not provide any evidence about Grievant's misconduct that resulted in the 1999 "final notice."

(Stipulation, Ex. G at 17 (italics in original).)  Having concluded that Schulenberg was not a repeat offender and that the 2006 conduct was an "isolated incident" (*id.* at 14) not sufficient to warrant discharge, the arbitrator ordered Freightliner to reinstate Schulenberg with a four-week suspension. (*Id.* at 18.)

Freightliner refused to reinstate Schulenberg.  On November 12, 2008, the Union filed suit against Freightliner seeking to enforce the October 3, 2008, arbitration award.  Freightliner filed an answer on December 4, 2008, with a counterclaim to vacate the arbitration award.  On February 17, 2009, the parties filed cross-motions for summary judgment and filed a stipulation to all of the material facts.

## *Standards*

### A.    Summary Judgment under Federal Rule of Civil Procedure 56.

Summary judgment is appropriate only when the record shows that "there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On their cross-motions for summary judgment the parties have stipulated to the material facts underlying their dispute and to the evidence supporting those facts. With the factual record not in dispute, the court's analysis centers on the law applicable to judicial enforcement of labor arbitration awards. The standard which governs the court's analysis follows below.

B.    Scope of Review in Actions to Enforce Labor Arbitration Awards.

Labor unions representing employees in an industry affecting commerce may bring lawsuits in federal court when they believe an employer has violated the labor contract. 29 U.S.C. §185(a). An employer violates the contract when it refuses to implement an arbitration award made in accordance with the parties' contractual grievance process. In such lawsuits, the courts' review of an arbitrator's award is narrow and limited.

The Supreme Court announced a strong public policy in favor of resolving labor disputes through arbitration in the cases known as the "*Steelworkers Trilogy*." *See United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564 (1960); *United Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574 (1960); and *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960) ("The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."). *See also Hawaii Teamsters and Allied Workers Union, Local 996 v. United Parcel Service*, 241 F.3d 1177, 1181 (9th Cir. 2001) ("Our task is, in essence, to review the procedural soundness of the arbitral decision, not its substantive merit."). Accordingly, "the courts play only a limited role when asked to review the decision of an arbitrator." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987).

The Ninth Circuit strictly follows these principles. *United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 173 (9th Cir. 1995) ("In this circuit, because federal labor policy strongly favors the resolution of labor disputes through arbitration, '[j]udicial scrutiny of an arbitrator's decision is *extremely* limited.' ") (italics in original, citations omitted).

Courts are not authorized to reconsider the merits of an award, as doing so would undermine the federal policy of settling labor disputes by arbitration. *Id.* An arbitration award must be upheld "as long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice.' *Id.*, citing *Enterprise Wheel*, 363 U.S. at 597. As long as the award represents a "plausible interpretation of the contract" the court is bound to enforce it. *United Food & Commercial Workers Union, Local 1119, AFL-CIO v. United Markets*, 784 F.2d 1413, 1415 (1986) (internal citations omitted). *Accord Van Waters & Rogers, Inc. v. Int'l Brotherhood of Teamsters*, 56 F.3d 1132, 1136 (9th Cir. 1995) ("An arbitration award must be confirmed '[a]s long as the arbitrator is *even arguably* construing or applying the contract and acting within the scope of his authority.") (italics in original). The court's task "is to determine *whether* the arbitrator interpreted the collective bargaining agreement, *not* whether he did so correctly." *Hawaii Teamsters*, 241 F.3d at 1178 (italics in original).

However, an arbitrator is not completely without constraints in deciding disputes submitted pursuant to a collective bargaining agreement. There are three exceptions to this deferential review standard. First, the court will not defer to the arbitrator's award if the award does not "draw its essence" from the collective bargaining agreement. *Enterprise Wheel*, 363 U.S. at 597. "An award draws its essence from the [collective bargaining agreement] when it is based on language in the CBA." *SFIC Props. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 94*, 103 F.3d

13 - FINDINGS AND RECOMMENDATIONS

923, 925 (9th Cir. 1996). As the Supreme Court observed:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Enterprise Wheel*, 363 U.S. at 597.[2] Thus, an award does not draw its essence from the contract when it "ignores the plain language of the contract and 'manifestly disregards' the contours of the agreement." *Stead Motors of Walnut Creek v. Automotive Machinists Lodge 1173*, 886 F.2d 1200, 1205 n.6 (9th Cir. 1989), *cert. denied*, 495 U.S. 946 (1990). *See also Fredrick Meiswinkel, Inc. v. Laborer's Union Local 261*, 744 F.2d 1374, 1376 (9th Cir. 1984) ("An award that conflicts directly with the contract cannot be a 'plausible interpretation.'" (citation omitted)); *United Markets*, 784 F.2d at 1415, 1416 (if the arbitrator's interpretation violates or is "in direct conflict with" the terms of the agreement, the interpretation is implausible and the court cannot enforce the award). In short, "an arbitrator's award is not bulletproof;" he is not free to "follow his own whims and biases" and "dispense his own brand of industrial justice." *Hawaii Teamsters*, 241 F.3d at 1181, 1182, citing *Garvey v. Roberts*, 203 F.3d 580, 588-89 (9th Cir.2000), and *Enterprise Wheel*, 363 U.S. at 597.

Second, an award will not be upheld if the arbitrator exceeded the boundaries of the issues presented in making the award. *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir. 1989). The arbitrator's determination of the scope of the review before him is entitled to the same level of deference as is the interpretation of the collective bargaining agreement itself. *Id.*

---

[2] Although an arbitrator may also look at industrial common law -- the practices of the industry and the shop, and plant customs which are part of the collective bargaining agreement although not expressed in it, *Virginia Mason Hospital v. Washington State Nurses Ass'n*, 511 F3d 908, 915 (9th Cir. 2007) -- neither party asserts that additional practices or customs are relevant or should have been considered by the arbitrator, and the arbitrator cited none in his decision.

Nonetheless, the contract limits an arbitrator's authority and the arbitrator "can bind the parties only on those issues that they have agreed to submit to him." *Fredrick Meiswinkel*, 744 F.2d at 1377.

Third, the court cannot uphold an arbitrator's award if the implementation of that award would violate public policy. *Misco*, 484 U.S. at 43. "A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." *Misco*, 484 U.S. at 373. The court must find that an explicit and well-defined public policy exists, and that the policy specifically precludes the relief the arbitrator awarded. *Foster Poultry Farms*, 74 F.3d at 174. "If a court relies on public policy to vacate an arbitral award reinstating an employee, it must be a policy that bars reinstatement. Courts cannot determine merely that there is a 'public policy' against a particular sort of behavior in society generally . . . ." *United Transp. Union v. Burlington N. R.R. Co.*, 864 F. Supp. 138, 141 (D. Or. 1994).

### Discussion

Summarized, the parties' arguments are these. The Union contends that the Court should affirm the October 3, 2008, arbitration award, and that it may not vacate the award because of the narrow scope of judicial review and the deference due an arbitrator's determination. Freightliner contends that the arbitration award should be vacated because it does not draw its essence from the CBA, and because reinstating Schulenberg to the workplace would violate the public policy against sexual harassment.

A.    Whether the Award Draws Its Essence from the Contract.

Freightliner's contention on this point focuses on the arbitrator's decision not to consider Schulenberg's 1999 final warning for violating Freightliner's sexual harassment policy; without it,

15 - FINDINGS AND RECOMMENDATIONS

the arbitrator found that Schulenberg was not a "repeat offender" and, thus, that just cause did not exist for termination based only on the 2006 misconduct. Freightliner further argues that the arbitrator's award violates the CBA's management rights clause because it strips Freightliner of its right to enforce its sexual harassment policy, and because it nullifies the CBA's grievance procedures by effectively vacating prior final discipline long after the contractual time limits for the Union or Schulenberg to challenge that discipline had expired. (Defendant's Memorandum in Support of Summary Judgment ("Freightliner Support Memo") 16-18.)

The Union contends that the CBA's management rights clause does not supercede the arbitrator's authority to determine whether just cause exists for disciplinary action. The Union also argues that the arbitrator properly found that Freightliner failed to prove the misconduct upon which the 1999 final warning was based because the final warning did not contain a description of the misconduct; thus, Freightliner "failed to prove what Grievant did in 1999." (Plaintiff Union's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Union Opp. Memo") 6, 10.) On this point, the Union asserts that Freightliner asks the court to "second-guess" the arbitrator's evidentiary ruling, which action would be outside the applicable standard for the court's review. (*Id*. at 12.)

Of the material facts stipulated to by the parties, two require specific discussion here. First, the arbitrator found that Freightliner issued the 1999 final warning to Schulenberg based on the allegation against Schulenberg contained in the BOLI complaint. The arbitrator found that Freightliner had issued the 1999 final warning to Schulenberg for a valid business reason: to inform Schulenberg that Freightliner was serious about prohibiting harassment in the workplace as was alleged in the complaint. (Stipulation, Ex. G at 5.) In reaching that conclusion, the arbitrator first

16 - FINDINGS AND RECOMMENDATIONS

described the 1999 BOLI complaint filed by three female employees, and he quoted the specific allegation that Schulenberg sexually harassed one of them by saying "Nice tongue ring. Are you going to start sucking a lot of peter?" (Stipulation, Ex. G at 5.) The arbitrator also noted that the "Employer investigated and . . . issued a letter to Grievant" based on this allegation. (*Id.*) Both the 1999 final warning letter and the BOLI complaint were received as evidence at the 2006 hearing. (Barnhart Decl. ¶¶ 1, 2, 3; Stipulation, Ex. G at 5, 15.)

Second, neither Schulenberg nor the Union grieved the 1999 final warning letter. (Stipulation ¶ 14.) The arbitrator expressly acknowledged this fact. (Stipulation, Ex. G at 5.) The parties further stipulated that Schulenberg never asked for a post-six month review of the warning letter, as was his right under the terms of the CBA. (Stipulation ¶ 14.)

Thus, prior to the 2006 arbitration of Schulenberg's termination, Schulenberg's 1999 final warning had been issued pursuant to, and become final discipline under, the terms of the CBA. The time within which the Union or Schulenberg could have grieved the 1999 discipline had expired and Schulenberg had never exercised his contractual right to ask Freightliner to review the discipline. Given these undisputed facts, the relevant inquiry for the court is whether the arbitrator had authority under the CBA to reconsider the factual basis for the 1999 final warning; more precisely, whether he had the authority to find that for purposes of the 2006 termination arbitration the factual basis for the 1999 final warning had not been proved in 1999. The court concludes that he did not have that authority. By disregarding Schulenberg's 1999 final warning for violating Freightliner's sexual harassment policy, the arbitrator did not rely on or interpret any term in the CBA. Instead, the arbitrator acted outside of and contrary to the CBA by effectively giving Schulenberg and the Union the ability to challenge final disciplinary action beyond the time limits expressly specified in the

CBA, which action "ignored the plain language of the contract." *Stead Motors*, 886 F.2d at 1205. *See also Hawaii Teamsters*, 241 F.3d at 1181 ("the arbitrator has no discretion to 'ignore the plain language of the' CBA"). This action also violated the express provision in the CBA that "the arbitrator shall have no power to render a decision which adds to, subtracts from, or modifies this Agreement." (Stipulation, Ex. A, at 41.)

The arbitrator did not merely draw inferences from the evidence, as the Union argues, or make an evidentiary ruling that, the Union urges, is beyond the court's scope of review. First, and contrary to the Union's contention, the arbitrator's decision makes clear that the arbitrator in fact did know what "Grievant did in 1999." As he acknowledged in his decision, the arbitrator received into evidence both the 1999 final discipline letter and the BOLI complaint that contained the description of the sexually charged comment Schulenberg made to a female coworker. Indeed, the arbitrator quoted, verbatim, the comment for which Mr. Schulenberg was disciplined. (Stipulation, Ex. G at 5, 15.) Thus, it is indisputable that the arbitrator knew what conduct gave rise to the 1999 final warning Freightliner issued to Schulenberg.

Second, the Union's other argument and the premise of the arbitrator's decision to disregard the 1999 final warning – that Freightliner was required to "prove" in a 2006 arbitration challenging Schulenberg's termination the conduct upon which the 1999 final warning was based – finds no support in the CBA and, in fact, is directly contrary to the contract's express provisions. Notably, the Union cites no provision of the CBA giving the arbitrator the authority to reject or reconsider the propriety of or factual merit for *prior* disciplinary actions which are not the subject of the discipline that the parties hired the arbitrator to decide. Nor does the Union cite any CBA provision that allows it or a bargaining-unit employee to challenge final discipline beyond the time limits established in the CBA, or to collaterally challenge it when grieving another disciplinary action based on separate

conduct.

For his part, the arbitrator cited no specific provision of the CBA, made no reference to the CBA generally, and cited to no supporting precedent in determining that he could determine whether the factual basis for the 1999 final warning was sufficient. *See, e.g., Hawaii Teamsters*, 241 F.3d at 1184-85 (listing "as part of what is known as the federal labor law" other arbitration awards interpreting the same provision at issue, statutes, case decisions, principles of contract law, practices, assumptions, understandings, the "common law of the shop," and "the industrial common law"). The arbitrator cited no history of the parties agreeing to extend the CBA's time lines for grieving disciplinary action or their agreement, here or in prior arbitrations, to allow arbitrators to review prior disciplinary action not the subject of the instant grievance. Nor did the arbitrator draw from any precedent of industry custom recognizing an arbitrator's authority to reexamine previously decided disciplinary action. Instead, he rejected the 1999 final warning solely because he did "not consider an *allegation* in lawsuit to be *proof* in this labor grievance arbitration," and from there declared that he would "not consider the 1999 final notice."

Thus, the arbitrator was not interpreting the CBA, "even arguably," when he rejected as insufficient the factual basis for the 1999 disciplinary action, as no provision in the CBA gave him the power to determine whether prior disciplinary action had been based on sufficient facts. Rather, he ignored "the plain language" of the CBA's bargained-for grievance process and governing time limitations for challenging discipline, choosing instead to import into the parties' contractual relationship a subjective criterion for which they had not bargained and to which they had not stipulated. In so doing, the arbitrator "followed his own whims and biases" and "dispense[d] his own brand of industrial justice." To be sure, the court's review of arbitration awards is "extremely limited," *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001), but the decisions are equally clear that the courts act within that narrow scope when they decline to enforce

19 - FINDINGS AND RECOMMENDATIONS

or they vacate and remand an arbitration award that does not draw its essence from the contract, or that ignores the contract's plain language, and which reflects the arbitrator's "own personal, subjective notions of fairness in collective bargaining." *Anheuser-Busch, Inc. v. Local 744*, 280 F.3d 1133, 1141 n.4 (7th Cir. 2002) ("Thus, it is evident that the arbitrator rejected the plain language of the contract, without ever claiming to be 'interpreting' any provision of it and in doing so *rewrote the contract and inscribed his own language upon the contract; something that he was not authorized to do.*") (italics in original). *See also Mountaineer Gas Company v. Oil, Chemical & Atomic Workers Int'l Union, et. al.*, 76 F.3d 606, 610 (4th Cir. 1996) (district court properly vacated arbitrator's award where arbitrator expressed "great difficulty" accepting policy providing for mandatory termination for positive drug tests; arbitrator "fashion[ed] an entire new remedy and infus[ed] his personal feelings and sense of fairness into the award[.]"); *Freightliner, LLC v. Teamsters Local 305*, 336 F. Supp. 2d 1118, 1125-26 (D. Or. 2004) (vacating arbitrator's reinstatement award because it "'ignore[d] the plain language of the contract'" where arbitrator disregarding the CBA's definition of "under the influence" and instead relied upon a statutory definition that the parties had not incorporated into the contract) (citation omitted).

Further on this key issue, the facts of the 1999 final warning were established once the time for challenging that discipline expired. Under the CBA, the Union or Schulenberg had the right to challenge the 1999 final warning within thirty days of its implementation. Within that time period they could have challenged the severity of the discipline or the facts upon which it was based. They did neither. Thus, the final warning and its factual basis became established between the parties; as the Union acknowledged at oral argument, the 1999 disciplinary action was final between the parties and had to be taken "within its four corners" in this matter.

This conclusion finds support from the existence of explicit time limits and stated methods for grieving or challenging discipline in the CBA. In his decision, the arbitrator explicitly observed

that neither "the Union nor [Schulenberg] grieved the warning" (Stipulation, Ex. G at 5), an acknowledgment by the arbitrator of that the 1999 discipline had not been challenged under the CBA's governing provisions. Those contractual provisions can have meaning only if they and the final results reached in accordance with them are respected.[3]

In addition, as noted above, the arbitrator considered and decided an issue not submitted to him by the parties: whether a sufficient factual basis existed for Schulenberg's 1999 final warning. *See Fredrick Meiswinkel*, 744 F.2d at 1377 (the contract limits an arbitrator's authority and the arbitrator "can bind the parties only on those issues that they have agreed to submit to him"). There is no dispute that the sole issue for the arbitrator to decide was whether Freightliner had terminated Schulenberg in 2006 for just cause; indeed, the arbitrator states this as the precise issue for him to determine. (*See* Stipulation, Ex. G at 1.) The propriety of Schulenberg's 1999 final warning had not been submitted to the arbitrator and was not before him, and the Union cites no authority or support for the proposition that the arbitrator was free to reconsider the merits of the 1999 disciplinary action. Thus, that determination was not his task at the 2006 arbitration, and by making it he decided an issue the parties never submitted to him for resolution. Although the parties bargained for an arbitrator to find facts on the dispute for which they retained him, Schulenberg's 2006 termination, nothing in the contract nor the record demonstrates that they retained him to revisit facts previously established between them regarding a previous disciplinary action.

As also mentioned above, the arbitrator violated the CBA's express prohibition of "render[ing] a decision which adds to, subtracts from, or modifies this Agreement." (Stipulation, Ex. A at 41.) Specifically, the arbitrator effectively gave the Union and Schulenberg two rights

---

[3] Thus, an arbitrator would act equally outside the contract if he revisited and decided to consider for purposes of progressive discipline a prior disciplinary action that had been withdrawn by the employer or overturned during the grievance process, because he determined that the facts upon which the discipline had been based in fact supported the disciplinary action.

21 - FINDINGS AND RECOMMENDATIONS

which the CBA did not grant. First, the arbitrator allowed the Union and Schulenberg to grieve disciplinary action after the CBA time limits for doing so had expired, when he reexamined and disregarded as not "proved" Schulenberg's 1999 discipline for sexual harassment. Second, he allowed the Union and Schulenberg to nullify a step in Schulenberg's progressive discipline process by eliminating from consideration the 1999 final warning, which discipline Freightliner had issued for Schulenberg's violation of the same policy for which Schulenberg's subsequent termination had been implemented. No provision of the CBA granted either remedy to the Union or a union employee, but the arbitrator's ruling here created both. *See United Markets*, 784 F.2d at 1416 (court of appeals affirmed district court's refusal to enforce the arbitrator's award as not drawing its essence from the contract, in part because the arbitrator ruled that contract's penalties would not be invoked until the employer committed three violations of the provision at issue instead of the two violations explicitly specified in the contract, thus giving the employer a "free bite").

In sum, the arbitrator did not interpret the contract, disregarded what the parties had put before him, added to the parties' CBA, and followed his own "whims or biases" in disregarding Schulenberg's 1999 final warning. As such, his decision did not "draw its essence" from the parties' contract. Accordingly, his award should be vacated.

B.    Whether Reinstatement Would Violate Public Policy.

Freightliner also argues that reinstating Schulenberg to its employment would violate the public policy underlying Title VII's prohibition against sexual harassment in the workplace. Freightliner argues that when Schulenberg's 1999 final warning for violating its sexual harassment policy is considered, he knowingly engaged in sexually harassment conduct even after he received a final warning that put him on notice that his employment would be terminated if he violated the policy again. Restoring such an employee to the workplace, Freightliner concludes, would perpetuate a hostile and offensive work environment and interfere with an employer's duty to

22 - FINDINGS AND RECOMMENDATIONS

maintain a workplace free of that environment, in contravention of well-established public policy. (Freightliner Support Memo 8-14.)

The court has found that the arbitrator's decision did not draw it essence from the CBA. Having so concluded, the court need not reach the public policy issue. *See Freightliner LLC v. Teamsters Local 305*, 336 F. Supp. 2d at 1122 ("[T]he court finds that the decision failed to draw its essence from the CBA; thus, the court need not decide whether the award violates public policy."). Furthermore, the court does not reach the public policy issue because, for the reasons explained below, this matter should be remanded to the arbitrator for further proceedings.

C.    Remand.

"[C]ourts have power to remand cases to an arbitration panel in certain circumstances under the Federal Arbitration Act, 9 U.S.C. §§ 10(e), 11, as well as under the federal common law governing labor arbitrations." *Dogherra v. Safeway Stores*, 679 F.2d 1293, 1297 (9th Cir. 1982). However, the Ninth Circuit considers remand unnecessary if it would "serve no purpose," *id.*, or if the remand would be futile. *See Am. Postal Workers v. United States Postal Service*, 682 F.2d 1280, 1285 (9th Cir. 1982) (stating that "remand would be futile" because the court "could not accord judicial deference to any other conclusion by the arbitrator").

The arbitrator's decision not to consider Schulenberg's 1999 final warning ultimately served as the foundation of his determination to vacate Schulenberg's termination and his decision that a 30-day suspension was the appropriate disciplinary action.    The arbitrator concluded that Schulenberg's 2006 conduct was not, by itself, sufficient to warrant termination of employment; instead, he concluded that Schulenberg's "conversation was an isolated incident.  Aside from the 1999 warning letter . . . the employer presented no evidence that Grievant previously engaged in sexual harassment." (Stipulation, Ex. A at 14.)  After dismissing the 1999 final warning and stating that he would not consider it in determining whether Schulenberg had been terminated for just cause,

23 - FINDINGS AND RECOMMENDATIONS

the arbitrator observed that arbitral discharge decisions "provide that 'just cause' requires progressive discipline, which includes an exception that grants the Employer authority to discharge an employee, without prior discipline, for particularly severe misconduct." *Id*. at 15. The arbitrator then concluded that

> "[w]ithin the range of conduct that is offensive in the workplace, Greivant's 2006 conduct was toward the less serious end of the continuum. I conclude that Grievant's conduct – while offensive and clearly unacceptable – was not so severe or heinous as to warrant an exception to the progressive discipline component of the just cause standard.

*Id*. at 16. The arbitrator expressly rejected Freightliner's argument that Schulenberg's discharge was appropriate because Schulenberg's violation was a "repeat offense," noting, as he had previously, that Freightliner had not "provide[d] any evidence about Greivant's misconduct that resulted in the 1999 'final notice.'" *Id*. at 17.

The arbitrator's reliance on both the isolated nature of Schulenberg's 2006 conduct and the absence of evidence that Schulenberg was a repeat offender in reaching his determination underscores the necessity for remanding this matter to the arbitrator. Specifically, the arbitrator must determine whether just cause existed for Schulenberg's termination, taking into consideration Schulenberg's 1999 final warning. Because this prior discipline must be considered, the arbitrator must reach the questions of whether Schulenberg's 2006 conduct no longer is an isolated incident, whether Schulenberg is a repeat offender, and what effect the answers to those questions has on Freightliner's decision to terminate Schulenberg's employment.

Remand for this purpose is consistent with the Supreme Court's guidance in this area. As the Court observed in *Garvey*, a court's role remains limited even in those instances in which it finds that an arbitrator's decision did not draw its essence from the contract:

24 - FINDINGS AND RECOMMENDATIONS

Consistent with this limited role, we said in *Misco* that "[e]ven in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result." 484 U.S., at 40-41, n.10, 108 S. Ct. 364. That step, we explained, "would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for" in their agreement. *Ibid.* Instead, the court should "simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement." *Ibid.*

*Garvey*, 532 U.S. at 510. Here, the case should be remanded to the arbitrator to determine whether, when considering Schulenberg's 1999 final warning, Freightliner terminated him for just cause in accordance with the CBA. That determination is what the parties bargained for in the first instance. *See Enterprise Wheel*, 363 U.S. at 599 ("It is the arbitrator's construction [of the agreement] which was bargained for[.]"). Thus, the arbitrator, not the court, should be the one to determine whether, in light of all the relevant evidence and circumstances, including the 1999 final warning and the conduct upon which it was based, and the considerations bearing on the just cause factors, Schulenberg's termination should or should not stand. For this reason, remand would serve a legitimate purpose and not be futile.

Remand also makes premature the court's consideration of Freightliner's public policy argument. The arbitrator rejected Freightliner's public policy argument but did so on the premise that Schulenberg was not a "repeat offender" and that the 2006 conduct was an isolated instance. If upon remand the arbitrator finds that just cause existed for Schulenberg's termination, then the issue of whether reinstating Schulenberg would violate public policy argument is moot. Alternatively, if the arbitrator determines that there was not just cause for Schulenberg's termination and that he should be reinstated, then the arbitrator should address and rule on Freightliner's public policy argument in light of all the evidence, including the 1999 final warning and the conduct upon which it was based. Accordingly, the court should not consider Freightliner's public policy argument

at this time.

D.    The Union's Request for Attorney Fees.

The Union argues that it is entitled to attorney fees to defend this case because Freightliner's position here is "frivolous." Plaintiff Union's Memorandum in Support of Motion for Summary Judgment 18. Nothing in the CBA provides for an award of attorney fees to the prevailing party in either a grievance arbitration or a subsequent lawsuit to enforce an arbitration award. (*See* Stipulation, Ex. A at 39-41.) Thus, the Union's fee request is analyzed under the bad faith exception to the "American Rule":  that, absent statute or enforceable contract, litigants pay their own attorneys' fees. *Phoenix Newspapers Inc. v. Phoenix Mailers Union Local 752, Intern. Broth. of Teamsters*, 989 F.2d 1077, 1084 (9th Cir. 1993). *See also Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Industries, Inc. of Arizona*, 84 F.3d 1186, 1192 (9th Cir. 1996) ("[A]n unjustified refusal to abide by an arbitrator's award may equate an act taken in bad faith, vexatiously or for oppressive reasons.").

The Union's request for attorney fees should be denied. Freightliner's position in this case was not taken in bad faith. Indeed, the court found meritorious Freightliner's challenge to the arbitrator's award. Furthermore, there is nothing in the record to suggest that Freightliner refused to implement the arbitrator's award for vexatious or oppressive reasons. Again, the court found Freightliner's position meritorious and the arguments Freightliner offered were based on facially legitimate reasons that included the goal of avoiding reinstating to the workplace an employee it believed had twice knowingly violated the company's sexual harassment policy. Accordingly, the Union's request for attorney fees should be denied.

*Conclusion*

For the reasons stated above, the Union's motion for summary judgment (# 12) should be DENIED, Freightliner's motion for summary judgment (# 14) should be GRANTED, and this matter

26 - FINDINGS AND RECOMMENDATIONS

should be REMANDED to the arbitrator for further proceedings consistent with this decision.

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due no later than **August 19, 2009**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, any party may file a response within fourteen days after the date the objections are filed. Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

Dated this 5th day of August, 2009.

John V. Acosta
United States Magistrate Judge

27 - FINDINGS AND RECOMMENDATIONS